**AUSTIN MUNICIPAL SECURITIES, INC., et al., Plaintiffs-Appellees,**

v.

**NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., et al., Defendants-Appellants.**

No. 84–1237.

United States Court of Appeals, Fifth Circuit.

April 15, 1985.

Miller, Keeton Bristow, Richard P. Keeton, Michael M. Wilson, Gerald J. Brown, Houston, Tex., Frank J. Wilson, Andrew McR. Barnes, Washington, D.C., for defendants-appellants.

Anne E. Chafer, Linda D. Fienberg, Washington, D.C., for amicus curiae S.E.C.

Byrd, Davis & Eisenberg, L. Tonnett Byrd, Spivey & Grigg, Broadus A. Spivey, Paul E. Knisely, Austin, Tex., for plaintiffs-appellees.

Before CLARK, Chief Judge, WISDOM, and HIGGINBOTHAM, Circuit Judges.

CLARK, Chief Judge:

### I

On this interlocutory appeal we hold that the National Association of Securities Dealers, Inc. (NASD) and its disciplinary officers have absolute immunity from further prosecution for personal liability on claims arising within the scope of their official duties; that the legislation authorizing the NASD disciplinary process implicitly repeals inconsistent provisions of the antitrust laws; and that the district court must stay proceedings pending arbitration for all arbitrable claims, despite the presence of intertwining nonarbitrable issues. We vacate the judgment of the district court and remand for further proceedings in light of the principles discussed in this opinion.

### II

Our analysis must begin with an overview of the regulatory framework governing the NASD disciplinary process. The NASD is a nonprofit Delaware corporation registered with the Securities and Ex-

change Commission (SEC) as a national securities association, pursuant to the Maloney Act, 52 Stat. 1070 (1938), 15 U.S.C. §§ 78*o* –3, *et seq.*, amending the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78a, *et seq.*

The Exchange Act provides a comprehensive system of federal regulation of the securities industry. As an integral part of that system, the Maloney Act established extensive guidelines for the formation and oversight of self-regulatory organizations, such as the NASD, and the registered stock exchanges, including the New York Stock Exchange (NYSE) and the American Stock Exchange. Congress delegated power to these organizations to enforce, at their own initiative, "compliance by members of the industry with both the legal requirements laid down in the Exchange Act and the ethical standards going beyond those requirements." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. National Association of Securities Dealers, Inc.*, 616 F.2d 1363, 1367 (5th Cir.1980), *quoting* S.Rep. No. 94–75, 94th Cong., 1st Sess. 23 (1975), 1975 U.S.Code Cong. & Ad.News 179, 201.

To prevent the misuse of this Congressionally-mandated power, Congress granted the SEC broad supervisory responsibilities over these self-regulatory organizations. First, an organization may not become a registered securities association unless its by-laws and rules conform to the Exchange Act. 15 U.S.C. § 78*o* –3(b). The NASD met this requirement in National Association of Securities Dealers, Inc., 5 S.E.C. 627 (1939).

The registered association is also subject to extensive oversight, supervision, and control by the SEC on an ongoing basis. 15 U.S.C. § 78s(a)(3)(B). With limited exceptions not relevant here, the SEC must approve all association rules, policies, practices, and interpretations prior to their implementation. 15 U.S.C. § 78s. These rules may not impose any burden on competition not necessary or appropriate to further the purposes of the Exchange Act. 15 U.S.C. § 78*o* –3(b)(9): In addition, the SEC may abrogate or add such rules as it deems necessary, if consistent with the requirements of the Exchange Act. 15 U.S.C. § 78s.

Every self-regulatory organization must comply with the provisions of the Exchange Act, its own rules, and the rules of both the SEC and Municipal Securities Rulemaking Board (MSRB). 15 U.S.C. § 78s(g)(1). Furthermore, these organizations must force compliance with these rules by their members and persons associated with members. 15 U.S.C. § 78s(h).

■ If an organization, member, or associate fails to comply with these requirements, the SEC has broad sanctioning power. The SEC can suspend or revoke the registration of the self-regulatory organization, or censure or restrict the activities, functions, and operations of the organization, a member, or an associate. *Merrill Lynch*, 616 F.2d at 1367. The SEC may remove from office or censure any officer or director of a self-regulatory organization if it finds she has wilfully violated the rules or abused her position. 15 U.S.C. § 78s(g)(2). Finally, the SEC may bring an action to enjoin any activity by the organization that violates the Exchange Act or rules promulgated thereunder. 15 U.S.C. § 78u(d). *See Merrill Lynch*, 616 F.2d at 1367.

The Maloney Act specifies certain procedural safeguards for the self-regulatory organization's disciplinary process. The organization must "bring specific charges, notify such member or person of, and give him an opportunity to defend against, such charges, and keep a record." 15 U.S.C. § 78*o* –3(h)(1). Any sanction imposed must be supported by a statement of the Act which constituted the violation, the specific provision or rule violated, the sanction imposed, and the reasons therefor. *Id.* The SEC closely scrutinizes the disciplinary process and must be satisfied the rules provide a fair procedure for disciplinary hearings. 15 U.S.C. §§ 78*o* –3(b)(8), 78s(b)(1), (2).

In *Merrill Lynch*, we discussed how the NASD has complied with these requirements regarding its disciplinary process:

In response to these statutory guidelines, the NASD has established detailed rules for the handling of. disciplinary matters concerning its members. Upon initiation of a complaint against an NASD member, either by a member of the public or the association itself, a hearing is held before one of thirteen District Business Conduct Committees. NASD Code of. Procedure for Handling Trade Practice Complaints, NASD Manual §§ 3003, 3004. The written decision of the local committee is then reviewed by the National Business Conduct Committee of the NASD. NASD Manual § 3014 (Explanation by the Board of Governors). The National Committee may then vote for further review by the Board of Governors of the NASD, or such review may be instigated on the motion of the aggrieved party or the Board of Governors itself. NASD Manual § 3014. Appeal by the aggrieved party to the Board of Governors is a right, not affected by the vote of the National Committee. *Id.* The written conclusions of the Board of Governors must then be filed with the SEC, which may review the matter on its own motion or on the motion of any aggrieved person. 15 U.S.C. § 78s(d)(1), (2). The SEC is authorized to affirm or modify any sanction, or to remand to the NASD for further proceedings. 15 U.S.C. § 78s(e)(1), (2). An appeal may then be had to the United States Court of Appeals. 15 U.S.C. § 78y(a).

616 F.2d at 1367. In short, "the NASD plays an important role in a complex self-regulatory scheme carefully set down by Congress. The self-regulatory power of the NASD is broad, but so is the range of administrative remedies Congress has provided for those aggrieved by NASD action." *Id.* at 1368.

This appeal focuses on the acts and responsibilities of the District Business Conduct Committees (DBCC's) in disciplining members of the NASD and their associates. The committee members who serve on the DBCCs are elected to office by the membership of the NASD in each district for a three year term. NASD Manual (CCH) ¶¶ 1410, 1411. Because these officers serve without pay for their work on the DBCC, they may continue to engage in their pecuniary investment activities during their tenure on the committee. *Id.* at ¶ 1456.

Members of the NASD staff assist the DBCC by performing investigative work, but the DBCC determines whether to prosecute a member or associate. The DBCC therefore acts as both the "prosecutor" and "adjudicator" in the disciplinary proceedings. The NASD has established detailed regulations governing the disciplinary process, outlined in the NASD Code of Procedure for Handling Trade Practice Complaints, *reprinted in, NASD Manual* ¶¶ 3001–26.

### III

The parties have stipulated, that for the purposes of this review of the district court's denial of defendants' motion for summary judgment, we should assume as true the allegations contained in plaintiffs' First Amendment Complaint. The plaintiffs consist of Austin Municipal Securities, Inc. and five of its associates. These associates were either registered principals or representatives of Austin during the relevant period, and all were the subject of discipline by the DBCC. (Plaintiffs are sometimes collectively referred to as "Austin.")

The twenty-three defendants can be categorized into three groups. First, plaintiffs sued each of the eleven DBCC members that prosecuted and adjudicated Austin's case.[1] Second, plaintiffs complained of the NASD, its District Director, Walker, and the NASD investigator who worked on the

---

1. DBCC No. 6, which has jurisdiction of Texas complaints, generally consists of eight members. The committee, however, appointed three temporary municipal securities experts to assist in this case. Austin has sued all eleven members, and we treat the temporary members the same as the permanent members to the extent that they were exercising their delegated discretion.

case, Benton. Finally, plaintiffs sued the investment securities firms that employed each of the DBCC members.

Austin Municipal Securities, Inc. was formed in 1975 as a registered broker/dealer in municipal securities, pursuant to 15 U.S.C. § 78o –4(a)(2). Austin became a member of the NASD in order to participate in the over-the-counter securities market on a preferential basis. *See* 15 U.S.C. § 78o –3(e).

Austin engaged exclusively in the purchase and sale of municipal bonds, specializing in the investment needs of Texas banks and bankers. By 1978, Austin had captured a substantial share of the municipal bond market in Texas. This business would otherwise have gone to other investment firms, including the defendant firms and their employees.

Prior to the events involved in this case, Austin was a member in good standing of the NASD, none of its associates had been the subject of NASD discipline, and no customer had complained about its business dealings with Austin. However, due to Austin's successful entry into the municipal bond market, the defendant firms and the DBCC members conspired to force Austin out of business. To this end, defend-

ants brought the machinery of the NASD disciplinary process against Austin.

During the investigation of its activities, the DBCC members violated the absolute confidentiality of the NASD disciplinary proceedings by leaking information to third persons. Some of these people conducted business with Austin, and others were either current or potential associates of the firm. The DBCC members called the firm and its employees, "a bunch of crooks," and said the firm might soon be out of business. These statements interfered with the firm's business relations, and defamed the professional and personal reputation of its associates.

At the conclusion of the investigation, the DBCC charged Austin with twelve counts of securities law violations, including securities fraud due to excessive mark-ups on 183 bond transactions. The mark-ups in question, however, were all below five percent of the market price, with most in the two to three percent range.[2]

## IV

A summary of the charges and their disposition appears in the margin.[3]

---

2. These mark-ups were in addition to the discount price at which Austin could purchase the securities from the market. *See Decision of the DBCC,* March 28, 1980, p. 16 (Plaintiff's Exhibit 4).

3. The DBCC charged Austin with the following violations. The dispositions by the DBCC and the NASD Board of Governors, which heard the appeal from the DBCC's decision, are indicated.

| CHARGE | DBCC | BOARD |
|---|---|---|
| 1) Exchange Act, Rule 10b–5 Selling securities at unfair and unreasonable prices on 183 bond transactions. | Guilty (on 175 of the 183 transactions.) | Not Guilty |
| 2) SEC Net Capital Rule 15c3–1 Permitting Austin's indebtedness to exceed net capital by 1500 percent. | Not Guilty | ----- |
| 3) Exchange Act, Rule 10b–5 "Overtrading"—Buying and selling when not related to market price. | Not Guilty | ----- |
| 4) Exchange Act, Rule 10b–5 "Parking transactions"—Buying bonds to protect Austin from market risk. | Not Guilty | ----- |

Following a two-day hearing, the DBCC dismissed six of the twelve counts of the complaint against Austin. It found Austin guilty of two violations of the Exchange Act, Rule 10b–5 (Counts One and Five), one violation of SEC Rules 17a–3 and 17a–4 (Count Seven), and three violations of the MSRB rules (Counts Nine, Ten, and Eleven). For these violations, the DBCC suspended the firm's NASD membership for three months and fined it $10,000. The DBCC also suspended various individual associates from trading and fined them over $41,000 plus costs.

Austin appealed these convictions on Counts One, Five, and Seven, as well as the sanctions imposed, to the NASD Board of Governors (Board). The Board stated that although it believed Austin's actual dollar profit on the bond transactions in Count One were "much higher than we believe is customary" and were "unfair," this unfairness simply did "not rise to a level [it considered] fraudulent." Therefore, the Board dismissed Count One. It also dismissed Count Five, but again noted that although not fraudulent, the mark-ups were "excessive" and perhaps unfair. Finally, the Board affirmed Austin's conviction on Count Seven for making the oral guarantees to repurchase bonds at cost if the customer chose to rescind the transaction.

In light of its findings, the Board reduced the penalties assessed against the plaintiffs. It cautioned, however, that:

> The reduction should not be construed as an approval of [Austin's] conduct. Rather as we have previously noted, we are concerned over the unfairness of their

| CHARGE | DBCC | BOARD |
|---|---|---|
| 5) Exchange Act, Rule 10b–5 "Churning"—Engaging in unnecessary bond swap transactions to generate extra commissions. | Guilty | Not Guilty |
| 6) Exchange Act, Rule 10b–5 Sending misleading confirmations of transactions regarding bond ratings. | Not Guilty | ----- |
| 7) SEC Rules 17a–3 and 17a–4 Making unrecorded oral guarantees to repurchase bonds at cost. | Guilty | Guilty |
| 8) Exchange Act, Rule 10b–5 Deceiving customers by allowing one to profit at the expense of another. | Not Guilty | ----- |
| 9) MSRB Rule G–6 Failing to include cancellation riders in fidelity bonds. | Guilty | Not Appealed |
| 10) MSRB Rule G–8 Failing to include information on account cards. | Guilty | Not Appealed |
| 11) MSRB Rule G–10 Failing to designate one person to maintain the books. | Guilty | Not Appealed |
| 12) Exchange Act, Rule 10b–5 Failing to reflect the correct time stamp on order tickets. | Not Guilty | ----- |

mark-ups. The dismissal of those allegations because they do not rise to the level of fraud does not mean that in the future we will not consider those activities for purposes of assessing penalties in another similar matter. Our major concern here is not with the percentage of profits but with the actual dollar profits on each trade and the particular circumstances of these trades. We will continue to look at the circumstances of each case to determine in our business judgment whether customers have been treated fairly.

The Board cautioned that Austin should consider its decision as a warning on mark-up practices, which could lead to more serious penalties if continued.

Austin did not appeal the Board's decision to the SEC as it was entitled to do under 15 U.S.C. § 78s(d)(2). Instead, plaintiffs filed the instant action against defendants seeking monetary damages for their economic loss, humiliation, and injury to their reputations. They also requested declaratory and injunctive relief to clear their records and terminate further prosecution.

## V

Specifically, plaintiffs charge defendants with the following deprivations of constitutional rights:

1) Deprivation of procedural due process, for failure to provide an impartial tribunal;

2) Conspiracy to deprive Austin of procedural due process;

3) Deprivation of liberty without due process to pursue their occupations free from arbitrary and unreasonable restraint; and

4) Deprivation of property (goodwill) without due process.

In addition, plaintiffs sued for the following nonconstitutional violations:

5) Malicious prosecution and abuse of process;

6) Defamation;

7) Interference with business relations; and

8) Antitrust

In response, defendants answered, denying the material allegations of plaintiffs' complaint, and simultaneously moved for entry of summary judgment, premised on their absolute immunity from suit for actions connected to their official duties. Defendants further moved to stay judicial proceedings and compel arbitration of plaintiff's claims concerning defendants' alleged acts falling outside the scope of their official duties.[4]

The district court denied defendants' motion in all respects without opinion. Defendants then filed a notice of appeal and petitioned the district court to certify its judgment as an appealable interlocutory order. The court refused on the ground that sufficient fact questions remained to prohibit interlocutory review, *citing Williams v. Collins,* 728 F.2d 721 (5th Cir. 1984). On May 29, 1984, an administrative panel of this court refused to stay proceedings in the district court. After oral argument, this hearing panel stayed the proceedings of the district court sua sponte on February 5, 1985.[5]

## VI

■ We must first determine whether we have jurisdiction of this interlocutory

---

**4.** Defendants also sought dismissal of the complaint for failure to exhaust administrative remedies, or in the alternative, for a stay of proceedings pending submission of plaintiffs' claims to the SEC. The district court stayed the proceedings until the SEC addressed the issues presented by Austin.

In its response, the SEC said it found "no indications of structural bias or unfairness in the proceeding" and that "the mark-up violations alleged in this case were [not] so clearly erroneous as to warrant an inference that the DBCC acted with specific bias."

On its own motion, the District Court subsequently vacated its stay order. Defendants then renewed their motions for partial summary judgment and for a stay order pending arbitration.

**5.** Meanwhile, in the district court discovery had proceeded to a limited extent. In June, plaintiffs had filed a Motion to Compel Discovery and for Sanctions. The defendants filed their answer in July. The district court had not acted upon this motion when the stay went into effect.

appeal. Defendants assert that an order denying summary judgment based on a claim of absolute immunity is immediately appealable. Generally, no appeal is permitted from a non-final order. But, under *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), a limited class of interlocutory appeals designated collateral orders is permitted.

*Cohen* established three criteria for determining when an interlocutory appeal is permissible. The appeal must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and decide an issue effectively unreviewable on appeal from a final judgment. *Id.* at 546–47, 69 S.Ct. at 1225–26. *See also Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 72 L.Ed.2d 349 (1982).

*Nixon* held that at least when an appeal raises serious and unsettled questions of law, an order denying absolute immunity is immediately appealable. *Id.*, 102 S.Ct. at 2698. Such an order satisfies the *Cohen* test because the issue is whether the defendant is subject to further prosecution. The right not to be put to trial is an important question completely separate from the merits of the action. Permitting appeal only after trial moots the issue.[6]

This court recently discussed whether an order denying summary judgment based on absolute immunity is immediately appealable in *Williams, supra.* Williams sued nine federal employees who participated in personnel and administrative proceedings which resulted in his discharge. The district court refused to dismiss the case based on absolute immunity. We took jurisdiction on appeal and held that "[f]ederal officials enjoy absolute immunity from common law tort liability for actions within the scope of their authority." *Id.* at 727.

Regarding appellate jurisdiction, we determined that a denial of absolute immunity is immediately appealable if the "entitlement to immunity is sufficiently free of fact questions as to present a question of law." *Id.* at 726 n. 7. We cautioned, however, that:

> many denials of claimed immunity in pretrial proceedings will not be in a posture for appellate review, in that entitlement to immunity will turn on disputed questions of fact or will otherwise be inextricably bound up with the merits of the claims.... [This right to appeal] only extends to an immunity that accords protection from trial as distinguished from possible defense to liability.

*Id.*

In the case at bar, the district court relied on *Williams* in rejecting the defendants' motion for summary judgment. The judge thought that sufficient fact issues remained to prevent an immediate appeal on the immunity issue. We disagree.

■ We have jurisdiction to determine whether these defendants have absolute immunity as a matter of law, because the facts critical to this issue are not disputed in the record of this case, which includes the record of the disciplinary proceedings by the DBCC, Board, and SEC. In addition, the organization and structure of the NASD and the statutes, rules, and regulations under which it operates are all matters of public record.

Plaintiffs contend that the intent with which the defendants instigated the disciplinary proceedings is crucial to whether they receive absolute immunity. Because this intent is a disputed fact issue, Austin urges us to reject jurisdiction of this appeal. As we discuss in more detail, *infra*, the intent with which these defendants operate is irrelevant to the absolute immunity issue. Therefore, because no material fact issue remains, we have jurisdiction under *Williams* of this appeal.[7]

---

6. *Nixon* did not analyze the first *Cohen* factor—namely whether the appellate court's decision would completely determine the question—because the parties did not dispute this contention.

The Court assumed this factor was satisfied. *See* 102 S.Ct. at 2698.

7. The circuits have split concerning whether *Nixon* requires that the appeal present a "seri-

## VII

No court has yet determined the extent of immunity for disciplinary officers of a Congressionally-mandated self-regulatory organization. Our analysis is guided, however, by Supreme Court decisions concerning the immunity of judges, prosecutors, and executive disciplinary officials. We first examine these cases and immunity in general, and then apply these principles to the facts at hand.

## A

■ The Supreme Court has consistently held that "government officials are entitled to some form of immunity from suits for damages." *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 2732, 72 L.Ed.2d 396 (1982). Generally, these officials receive only a qualified immunity, which protects them from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.*, 102 S.Ct. at 2738.

■ Qualified immunity protects officials from liability, but does not provide complete protection from trial and the pro-

cedures incidental thereto, such as discovery. Although discovery should not proceed in an immunity case until the court determines that the law in question was clearly established at the time of the official's conduct, *id.* at 2739, officials possessing qualified immunity must often wait until the conclusion of a trial before immunity protects their actions.[8]

■ Qualified immunity attempts to balance the need to protect officials from harassing and often frivolous lawsuits, with the need to provide relief to those subjected to an abuse of office. *Id.* at 2736. Requiring the official to vindicate his actions through a trial costs not only the defendant officials, but also society as a whole, by diverting the official's attention from his duties, deterring citizens from accepting public office, and burdening our already overcrowded and expensive judicial system. *Id.*

In contrast, for the victim of an abuse of office, a personal action for damages against the offending official may offer the only realistic method for vindicating constitutional guarantees. *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57

ous and unsettled question of law" before jurisdiction is proper. *Compare Bever v. Gilbertson*, 724 F.2d 1083 (4th Cir.1984) (denial of absolute immunity automatically appealable); *with Evans v. Dillahunty*, 711 F.2d 828, 830 (8th Cir. 1983) (appealable if no facts disputed so that immunity issue is decided as matter of law); *Chavez v. Singer*, 698 F.2d 420, 421 (10th Cir. 1983) (court reached the merits of the immunity issue only after finding a "serious and unsettled question."); *and McSurely v. McClellan*, 697 F.2d 309, 315–16 (D.C.Cir.1982) (absolute immunity denial immediately appealable).

We decided in *Williams* that orders denying claims of absolute immunity are always appealable provided they do not present issues of fact, regardless of whether they involve a serious and unsettled question of law. *Id.* at 726 n. 7. *See also Elliott v. Perez*, 751 F.2d 1472, 1476 n. 9 (5th Cir.1985); *Kenyatta v. Moore*, 744 F.2d 1179, 1183 (5th Cir.1984); *Metlin v. Palastra*, 729 F.2d 353, 355 (5th Cir.1984). We do not depart from that rule, but note that this appeal raises numerous serious and unsettled questions of law, if such a finding were required. Among the serious, unsettled questions involved are determining the scope of immunity for disciplinary officers of a self-regulatory system, and for the

organization of the NASD, its staff, and member firms; and deciding whether the antitrust laws are impliedly repealed as regards the NASD disciplinary process.

We further note that this case satisfies the *Cohen* collateral order doctrine. Our decision conclusively determines that some defendants are entitled to absolute immunity from further prosecution on certain causes of action asserted. As in *Williams*, the absolute immunity question raises an important issue completely separate from the merits of the case. Finally, the right not to proceed to trial is rendered unreviewable if it must await appeal from a final judgment.

8. *Harlow* recognized, however, that officials who enjoy absolute or qualified immunity should be protected, when possible, from the burdens of discovery as well as trial by stringent application of summary disposition procedures. 102 S.Ct. at 2738–39. We recently complemented this principle in *Elliott v. Perez*, 751 F.2d 1472 (5th Cir.1985), by requiring a plaintiff to plead specific facts to demonstrate why the official sued is not entitled to immunity. These decisions evince a narrowing of the distinctions between the protection afforded by absolute and qualified immunity.

L.Ed.2d 895 (1978). *See also, Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 410, 91 S.Ct. 1999, 2011, 29 L.Ed.2d 619 (1971). Injunctive or declaratory relief provides little compensation to one who has already been injured. 438 U.S. at 504, 98 S.Ct. at 2910. Foreclosing a victim's ability to bring suit thus increases the potential of lawless conduct by an official. *Id.* at 506, 98 S.Ct. at 2910.

■ Our judicial system assumes that all individuals, whatever their official position, are subject to law. *Id.*

No man in this country is so high that he is above the law. No officer of the law may set that law of defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it.

*United States v. Lee,* 106 U.S. (16 Otto) 196, 220, 1 S.Ct. 240, 261, 27 L.Ed. 171 (1882). *See also Butz,* 438 U.S. at 506, 98 S.Ct. at 2910. Qualified immunity reconciles these conflicting factors by subjecting an official to liability only when he has intentionally violated a person's constitutional rights.

### B

Some official positions, however, require greater protection than qualified immunity provides. Due to the specialized functions these officers perform, courts have granted them absolute immunity from suit for actions falling within the outer scope of their official duties. *Nixon,* 102 S.Ct. at 2699, 2705.

■ Implicit in the grant of absolute immunity is the recognition that the victim of an abuse of office may receive no recompense for the injury done. The foreclosure of this relief is mandated, however, by the potential disruption created by permitting a civil cause of action. Judge Learned Hand stated in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2 Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950):

It does indeed go without saying that an official, who is in fact guilty of using his powers to vent his spleen upon others, or for any other personal motive not connected with the public good, should not escape liability for the injuries he may so cause; and, if it were possible in practice to confine such complaints to the guilty, it would be monstrous to deny recovery. The justification for doing so is that it is impossible to know whether the claim is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.... As is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

Officials protected by absolute immunity need not face the rigors of full discovery or trial for claims arising within the outer scope of their official duties. Such officials, however, are not excused from all discovery. They are subject to discovery at least to the extent necessary to determine whether their actions were taken within the scope of their authority. Such inquiry should be a limited intrusion.

■ Because absolute immunity exempts an official from personal liability, those claiming the immunity bear the burden of proving that public policy requires such broad protection of their actions. *Butz,* 438 U.S. at 506, 98 S.Ct. at 2911.

All conduct of officials is not immune. In seeking to define what activities fall within the outer perimeter of an official's conduct, courts have limited this extraordinary foreclosure of remedies only to the extent necessary to permit the proper functioning of the regulatory system. *See Nixon,* 102 S.Ct. at 2705; *Butz,* 438 U.S. at 489–91, 98 S.Ct. at 2902–03.

■ Obviously, the regulatory system receives no benefit from immunizing an official who violates a person's constitutional or statutory rights by actions outside the ambit of his office. In such a case, the threat of harassing lawsuits against officers is outweighed by the potential for wrongful deprivation. Rather than grant immunity, the possibility of disruption of the regulatory system is to be reduced by strict application of summary disposition procedures to weed out meritless claims. *See Butz* at 507–08, 98 S.Ct. at 2911. The difficulty comes, not in describing the boundaries but in determining where challenged conduct falls.

It is over-broad to say that every abuse of office or intentional violation of rights falls outside the scope of the official's duties. We rejected this argument in *Williams*, 728 F.2d at 727. *Gregoire*, 177 F.2d at 581 observed:

A moment's reflection shows, however, that that cannot be the meaning of the limitation without defeating the whole doctrine. What is meant by saying that the officer must be acting within his power cannot be more than that the occasion must be such as would have justified the act, if he had been using his power for any of the purposes on whose account it was vested in him.

*See also Nixon*, 102 S.Ct. at 2705; *Barr v. Matteo*, 360 U.S. 564, 572, 79 S.Ct. 1335, 1340, 3 L.Ed.2d 1434 (1959).

■ Using this analysis, a court must examine the official's behavior to see if he was acting in a capacity for which he possessed discretionary authority. As to actions which arguably fall within the range of permissible actions, absolute immunity protects the official from civil liability for those actions. If, however, the official fails to posit a valid function of office calling for his action, then the act falls outside the scope of his authority, and he must defend the claim. *See Williams* at 727.

■ In deciding whether an officer is entitled to absolute immunity, the courts look first to constitutional, congressional, and historical guidance, and then they examine the immunity historically accorded analogous officials at common law. *Nixon*, 102 S.Ct. at 2701. Under this procedure, the Court has extended absolute immunity to a variety of government positions including the President, *id.* at 2705, judges, *see, e.g., Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); prosecutors, *see, e.g., Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), legislators, *see, e.g., Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); and legislative aides acting in their legislative capacity, *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972).

In *Butz*, the Court granted absolute immunity to administrative officials in the Department of Agriculture, who performed functions similar to those of judges and prosecutors. The Court developed a tripartite formula for evaluating the need to afford an official absolute immunity. Under this test, if:

a) the official's functions share the characteristics of the judicial process;

b) the official's activities are likely to result in recriminatory lawsuits by disappointed parties; and

c) sufficient safeguards exist in the regulatory framework to control unconstitutional conduct,

then that person's official conduct is absolutely immune from civil liability. 438 U.S. at 510–13, 102 S.Ct. at 2913–14.

On the facts of *Butz*, the hearing examiner, administrative law judge, and agency prosecuting officer all satisfied these criteria and were granted absolute immunity. First, they acted as judges and prosecutors, despite having acted in an administrative as opposed to a judicial forum, because their roles were "functionally comparable" to their judicial counterparts. Second, they would likely be the targets of recriminatory lawsuits brought by the parties they prosecuted. Finally, the relevant statutes and regulations, including the Administrative Procedure Act (APA), provided ade-

quate safeguards to control unconstitutional conduct, so an abuse of office was not likely to go uncorrected.

## C

The cases discussed in section B involved grants of absolute immunity to government officials. None indicate, however, whether such immunity may extend to private individuals and organizations who work in quasi-governmental capacities such as the defendants here. To determine this, we will apply the *Butz* tripartite formula and look to analogous circuit court decisions to each group of defendants separately.

### 1. The DBCC Disciplinary Officers

▆▆▆ The DBCC members satisfy the *Butz* requirements. They are entitled to absolute immunity from further prosecution for civil liability for their actions taken within the outer scope of their official duties. The first prong of *Butz* is satisfied to the extent that the committee members acted as prosecutors or adjudicators when disciplining Austin.[9] The DBCC decided which charges would be brought against Austin, a traditional prosecutorial function, and then adjudicated Austin's guilt, which clearly is functionally equivalent to a judge. There is nothing constitutionally infirm about the DBCC performing both prosecutorial and adjudicatory functions. *See Withrow v. Larkin,* 421 U.S. 35, 56–57,

95 S.Ct. 1456, 1469, 43 L.Ed.2d 712 (1975). Thus, the first test of *Butz* is satisfied.

We also find that the DBCC officers are likely targets for suit because they must discipline members for violating the securities laws and regulations. The Supreme Court noted the tendency of individuals subject to discipline to vindicate themselves in the courts. *Butz,* 438 U.S. at 515, 98 S.Ct. at 2915. The DBCC officers are subject to the same likelihood of suit as their administrative and judicial counterparts.

Finally, the statutory framework of the NASD disciplinary process contains sufficient safeguards to control unconstitutional conduct. Austin vigorously disputes this assessment, claiming that distinctions between the statutory systems in *Butz* and that present in this case preclude absolute immunity for the instant defendants. We disagree.

Austin asserts that the DBCC members are not subject to the rigid constraints of the APA. Administrative law judges under the APA may not perform activities inconsistent with their duties as hearing examiners; they are insulated from outside influence; they may not conduct ex parte communications; cases are assigned to them in rotation; they may be removed only for good cause; and their pay is regulated by the Civil Service Commission. *See generally* Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* The APA's requirements

---

9. In their First Amended Complaint, plaintiffs contend that the defendants conducted a malicious investigation before prosecuting Austin. In its brief on appeal, Austin asserts that the complaint states that the DBCC members and NASD participated in this investigation. If true, Austin contends that such activity falls outside these defendants' prosecutorial or adjudicatory roles and therefore deserves no immunity. *See Imbler,* 424 U.S. at 430–31 & n. 33, 96 S.Ct. at 994–95 & n. 33. *Imbler,* however, did not decide what activities incidental to the commencement and prosecution of charges would receive immunity. *Harlow,* 102 S.Ct. at 2735 n. 16.

Our circuit has stated that prosecutorial immunity extends to actions that are a "necessary and integral part of a prosecutor's role in the judicial system." *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979) (footnote omitted). Thus, we have held that actions in initiating and pursuing a prosecution and in presenting the

prosecutor's case warrant prosecutorial immunity. *Id.; Prince v. Wallace,* 568 F.2d 1176, 1178 (5th Cir.1978). Immunity also extends to filing complaints, instituting arrest or search proceedings, and drawing indictments or informations. *Henzel,* at 657, *citing, Sykes v. California,* 497 F.2d 197, 200 (9th Cir.1974).

Austin has not alleged any facts to show how the DBCC members or NASD have participated in this malicious investigation outside of the above mentioned activities. Indeed, it is doubtful whether Austin ever pleaded "malicious investigation" or merely "malicious prosecution" and "abuse of process." While we are inclined to find that Austin failed to plead this cause of action, because we are remanding this case for further considerations, we direct the district court to evaluate this contention, especially in light of the more stringent pleading requirements imposed by *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985).

help insure that the hearing examiner exercises independent judgment. *Butz,* at 512–14, 98 S.Ct. at 2914–15.

The gravamen of Austin's objections to the NASD procedures is that private competitors in the industry adjudicate their case. Because the DBCC members serve without pay, they may continue their securities investment work during their tenure on the committee. Austin contends these members are not isolated from outside influence, so they cannot be impartial and therefore should not receive absolute immunity.

Austin's contention reaches the heart of the self-regulatory system established by Congress, because in any such system, the regulators will a fortiori be competitors in the industry. Congress expressly created this system, however, so that the membership could apply specialized business expertise in the regulation of this complex industry. This forcefully presents the tension between the issues of whether this self-regulatory system has adequate safeguards against abuse of office and whether it can function effectively in the absence of absolute immunity from civil liability.

The summary of the NASD and DBCC procedures in Part II, above convinces us that this regulatory system adequately protects against such abuse. The SEC has pervasive oversight authority in the promulgation and enforcement of NASD regulations and disciplinary procedures. The SEC also has the power to discipline any DBCC officers that violate the rules or abuse their positions.

The procedural safeguards imposed by the Maloney Act and the SEC and NASD rules on the NASD disciplinary process are sufficient to check abuses. These procedures include three levels of appellate review as of right, including an appeal to this court.

Austin asserts that vindication on appeal does not rectify the expense and injury to one's reputation incurred by having to defend against improper prosecution. In the calculus of absolute immunity, this hazard is precisely the same as would be faced in any other judicial or administrative proceeding of a regulatory nature.

The imposition of personal liability on disciplinary officers would not greatly enhance the vindication of personal rights. Even though a civil cause of action against the DBCC officers for personal liability is foreclosed, suits for injunctive or declaratory relief may still be brought. Disciplinary officers are also subject to criminal prosecution for any violations of federal or state laws. *See Dennis v. Sparks,* 449 U.S. 24, 31, 101 S.Ct. 183, 188, 66 L.Ed.2d 185 (1980); *O'Shea v. Littleton,* 414 U.S. 488, 503, 94 S.Ct. 669, 679, 38 L.Ed.2d 674 (1974). Peer pressure, the threat of sanctions and the industry's need for an honest, respected system all operate as checks on the conduct of such officers.

Our decision is bolstered by analogous cases granting absolute immunity to disciplinary committee members of bar associations. *See Simons v. Bellinger,* 643 F.2d 774 (D.C.Cir.1980); *Slavin v. Curry,* 574 F.2d 1256 (5th Cir.1978). The bar committees closely resemble the DBCC. They are composed of private "competitors" and perform both prosecutorial and adjudicative functions in enforcing a self-regulatory disciplinary process. *See Simons,* at 780; *Slavin* at 1266. The bar committees are supervised by the courts, while the NASD is governed directly by the SEC, and indirectly by Congress and the courts. Furthermore, both the bar committee and DBCC members are governed by ethical standards imposed by their professions. *Compare* ABA Model Code of Professional Responsibility *with NASD Manual.*

The courts noted that the bar committee members acted as surrogates for judges, and merely served for the convenience and efficiency of the judicial system. *Simons,* at 781; *Slavin,* at 1266. Thus, members of the committees received the same immunity as judges would possess if they had acted directly. *Slavin,* at 1266. *Cf. Gravel, supra,* 408 U.S. at 616–17, 92 S.Ct. at 2622–23 (legislative aides receive immunity because they act as surrogates for the Congressmen). In the same fashion, NASD

disciplinary officers serve as surrogates for the SEC, and should receive the same immunity their principles possess. *See Trama v. New York Stock Exchange,* Fed. Sec.L.Rptr. [1979 Transfer Binder] ¶ 94,919 (S.D.N.Y.1978) (NYSE is an arm of the SEC).

Our decision is reinforced by cases granting absolute immunity to arbitrators. *See Corey v. New York Stock Exchange,* 691 F.2d 1205, 1208–11 (6th Cir.1982); *Tamari v. Conrad,* 552 F.2d 778, 780 (7th Cir.1977); *Cahn v. International Ladies' Garmet Union,* 311 F.2d 113 (3rd Cir.1962). Arbitrators are not employed by the government and are not subject to the provisions of the A.P.A. Instead, they are private individuals employed by the parties to resolve their disputes.

*Corey* reasoned that arbitrators satisfy the *Butz* criteria. First, arbitrators are functionally comparable to judges and agency hearing examiners even though the arbitration was not statutorily mandated and the arbitrators were not court appointed. 691 F.2d at 1209. Second, arbitrators are also likely targets of recriminatory lawsuits by disappointed parties. Third, sufficient safeguards were present to control unconstitutional conduct. Specifically, arbitration is an adversarial process, providing a hearing where the parties have the right to have an attorney, present evidence, cross examine witnesses, and receive a written decision by the court. The parties voluntarily agreed to submit their disputes to arbitration before an impartial arbiter. Finally, "[p]aramount among these safeguards is the right of judicial review." *Id., citing Butz,* 438 U.S. at 512–14, 98 S.Ct. at 2913–14. These decisions granting absolute immunity to arbitrators confirm the grant of protection to similarly situated DBCC members.

Austin relies on two cases that granted only qualified immunity to disciplinary officers in a self-regulatory system. *Bruan, Gordon & Co. v. Hellmers,* 502 F.Supp. 897 (S.D.N.Y.1980) (NASD); and *Trama, supra* (NYSE). Both cases, however, expressly reserved the question of whether these officers could receive absolute immunity. *Trama* stated, though, at ¶ 94,920, "the rationale behind the grant of absolute immunity to certain adjudicatory agencies applies forcefully to this case and strengthens today's decision to dismiss plaintiffs' complaint."

Instead of deciding the absolute immunity issue, *Bruan, Gordon* found the NASD by-laws may have waived NASD's immunity. *Bruan, Gordon* based this potential waiver on article I, section 4(a)(3) of the by-laws, which requires that when applying for membership in NASD, an applicant must agree that NASD, its staff, and committee members shall not be liable to the applicant except for wilful malfeasance. *Bruan, Gordon* held that this provision at least created a fact issue as to whether the NASD waived its immunity, and therefore refused to grant absolute immunity. 502 F.Supp. at 903. We disagree.

■ A waiver of immunity must be intentional, *Wells Fargo Business Credit v. Ben Kozloff, Inc.,* 695 F.2d 940, 947 (5th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), be distinctly made, *Capital Rental Equipment Co. v. Pacific Indemnity Co.,* 193 F.Supp. 897, 900 (W.D. Tex.1961), and appear clearly, *B–M–G Investment Co. v. Continental Moss-Gordin, Inc.,* 320 F.Supp. 968, 972 (N.D.Tex.1969), *aff'd on issue cited and remanded in part on other issue,* 437 F.2d 892, 893 (5th Cir.), *cert. denied,* 402 U.S. 989, 91 S.Ct. 1668, 29 L.Ed.2d 154 (1971). The NASD by-law provision by itself fails to meet these requirements.

The agreement is one made, not by the NASD, but by an applicant for membership. While the member may be said to be making an unambiguous waiver of its right to sue the NASD, it is not at all clear that NASD thereby waives its own immunity.

■ The shortfall of the provision as a distinct waiver of immunity by NASD becomes even more apparent when considered in conjunction with the range of NASD's activities covered by the applicant's waiver. The NASD performs myri-

ads of activities in which it and its officers play no adjudicatory role. These include general administrative functions and the operation of the NASDAQ automated quotations system used in the over-the-counter securities market. Defendants lack immunity for these activities. It is unrealistic to consider the waiver by the applicant as extending past these functions to the area of adjudicators' responsibility covered by absolute immunity. To preserve the effective functioning of the adjudicatory system, we hold this clause does not waive absolute immunity. Article I, section 4(a)(3) fails, as a matter of law, to clearly, intentionally, and directly waive defendants' absolute immunity.

The DBCC members have satisfied all of the *Butz* tests. They are entitled to absolute immunity from civil liability for their actions taken within the outer scope of their disciplinary duties.

### 2. *The NASD and its Staff*

Austin contends that the NASD as an entity lacks immunity, regardless of the immunity of its officers or committee members. Plaintiffs rely on *Owen v. City of Independence, Missouri*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), for support. *Owen* refused to extend immunity to a municipality for liability under 42 U.S.C. § 1983 for civil rights violations. The Court feared that granting such immunity might eviscerate the Civil Rights Act, and stated the scope of the city's immunity turned on the proper construction of 42 U.S.C. § 1983. 445 U.S. at 635, 100 S.Ct. at 1407. Rather than testing municipal immunity under § 1983, we must look to the Maloney Act for initial guidance on NASD's immunity here.

■ Furthermore, *Owen* involved the application of traditional sovereign immunity to local governmental units. The NASD exercises quasi-governmental authority pursuant to a statutory scheme enacted by the national sovereign. The NASD's actions are more akin to those of the SEC, which has sovereign immunity from damage suits, *Sprecher v. Graber*, 716 F.2d 968, 973–74 (2d Cir.1983), than to municipal

activities. Although the NASD possesses no sovereign power, we conclude that under the rationale of *Butz*, it requires absolute immunity from civil liability for actions connected with the disciplining of its members.

The NASD was sued in this case in its representative capacity, and the claims made against it were the result of actions of the DBCC members' conduct. Plaintiffs alleged NASD complicity in the conspiracy but have not suggested how the organization participated beyond the actions of its immune officials. Such allegations are not sufficient to withstand a summary judgment motion under our recent opinion of *Elliott v. Perez*, 751 F.2d 1472 (5th Cir. 1985).

Since no connection with plaintiffs is asserted except through the conduct of DBCC members, the NASD was acting in an adjudicatory and prosecutorial capacity. The NASD is required by statute to enforce the securities laws. We have held that the disciplinary actions taken by DBCC members were within the outer scope of their authority. It would be anomalous to refuse to absolutely immunize the parent organization while at the same time granting immunity to its members and officers when the latter's actions form the sole basis for charges laid against the parent.

The NASD is also likely to be the target of recriminatory lawsuits, because as the entity which creates and supervises the DBCC it is a more visible target. Finally, the pervasive SEC, Congressional, and court oversight provided by the regulatory system control unlawful NASD conduct to an extent equal to the control imposed on the DBCC members. We therefore conclude the NASD is entitled to absolute immunity for its role in disciplining its members and associates. *Cf. Clark v. Washington*, 366 F.2d 678, 681 (9th Cir.1966) (bar disciplinary committee as an entity receives absolute immunity).

■ We need not discuss the immunity of the NASD staff members, Walker and

Benton. The defendants concede that Walker and Benton do not have absolute immunity for their roles in the investigation of Austin and as administrators. This comports with *Imbler v. Pachtman, supra,* and other cases discussing the immunity of prosecutors and investigators. We are not required to decide whether these staff members may be entitled to qualified immunity. *See, e.g., Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). For any actions the staff has taken in a prosecutorial role, however, its members would be entitled to receive absolute immunity based on the same analysis as set out for the DBCC members. We remand to the district court the determination of whether in any of their actions Benton and Walker may be absolutely immune.

### 3. *The Defendant Firms*

The defendant firms which employed DBCC members contend they are entitled to absolute immunity because their only alleged unlawful conduct was connected to the abuse of the NASD disciplinary process by their DBCC member associates. They argue that refusing to grant immunity to the firms could frustrate the NASD disciplinary system. Member firms, they say, will become reluctant to permit their associates to become DBCC members because such responsibility would expose the firm to civil liability, even though the associates were absolutely immune from suit. Recruiting competent and impartial members to serve on the DBCC might become difficult.

■■■ Until this potential disincentive is proven to be more than a possibility, it is too tenuous to warrant the grant to these firms of absolute immunity. In effect, a firm would receive total immunity from suit merely because one of its associates serves on a disciplinary committee. Plaintiffs have alleged that these firms conspired with the other defendants including their own associates who were DBCC members to subvert the disciplinary process.

In *Dennis, supra,* the Supreme Court rejected derivative immunity for private persons who conspire with immune parties to violate the rights of others. *Dennis* concluded:

[T]he potential harm to the public from denying immunity to private coconspirators is outweighed by the benefits of providing a remedy against those private persons who participate in subverting the judicial process and in so doing inflict injury on other persons.

449 U.S. at 31–32; 101 S.Ct. at 188. This precedent has cogent force here. Under the present pleadings and proof, the firms do not have absolute immunity from prosecution. We remand to the district court for further proceedings on these claims.

If this allegation is supported by proof that the conspiratorial action on the part of the firms involved independent encouragement to disciplinary officers not to hold the balance true, then no purpose of absolute immunity would be served by insulating their separate wrong. On the other hand, if the proof shows no more than that the disciplinary officers took action within the ambit of their offices and their firms are sought to be held purely as principals on a derivative basis the case would be different. We are now at the pleading stage and the broader conjecture must govern.

### D

In light of these immunity determinations, we remand to the district court to apply these principles to the specific allegations in Austin's complaint. The court should dismiss any claims against (1) DBCC members, (2) NASD, or (3) NASD staff members to the extent those members acted in a prosecutorial capacity where such claims are based on actions falling within the perimeter of official authority.

■■■ The constitutional and the malicious prosecution/abuse of process claims appear to be subject to the immunity defense. In addition, some of the defamation and interference with business relations claims also appear to warrant immunity protection. For example, Austin contends

that the DBCC and NASD defamed plaintiffs by publishing the charges against Austin. Such activity is required by Congress, however, *see* 15 U.S.C. § 78o –3(h)(1), and therefore is protected activity. In contrast, other defamation claims such as those asserting that defendants called plaintiffs "a bunch of crooks" and said Austin might soon be out of business clearly fall outside the scope of defendants' disciplinary authority. Such conduct, if proven, receives no immunity. The district court, however, is in a better position to sift through the various allegations to determine what claims survive this appeal, so we remand to that court for further proceedings.

Our decision to remand in no way conflicts with the jurisdictional requirement that fact issues could thwart this interlocutory appeal. Free of fact disputes, the record establishes that the NASD and DBCC members are entitled to absolute immunity for actions falling within the scope of their authority. All that is left for the district court to decide on facts is whether specific acts and allegations fall within this perimeter.

## VIII

Austin's complaint charges defendants with antitrust violations under the Sherman Act, 15 U.S.C. § 1, *et seq.*, for conspiring to force Austin out of business by using the NASD disciplinary process. According to plaintiffs, the defendants also conducted a program of nonadjudicatory action, designed to further this goal, such as by defaming Austin and interfering with its business relations.

The SEC, as amicus curiae, contends that Congress implicitly repealed the antitrust laws when it enacted the self-regulatory disciplinary process for the securities industry. After reviewing analogous precedent, we agree that Congress necessarily repealed the antitrust laws insofar as those laws condemn actions required to be undertaken in the effectuation of NASD disciplinary process.

Implicit repeal of the antitrust laws is not favored, and is justified only by a clear showing of repugnancy between the antitrust laws and the regulatory system. *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2443, 45 L.Ed.2d 486 (1975) (*NASD*). Repeal will only be implied "if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

*Silver* first considered whether the antitrust laws applied to the NYSE's rules governing disconnecting wire service between member and nonmember securities firms. The Court declined to infer a repeal of the antitrust laws, because the SEC lacked authority to review the Exchange's actions. Thus, no conflict existed between the antitrust laws and the securities regulatory system. 373 U.S. at 358, 83 S.Ct. at 1257. The Court, however, contrasted the facts in *Silver*, with the self-regulatory disciplinary process established by the Maloney Act, stating:

> Were there [SEC] jurisdiction and ensuing judicial review for scrutiny of a particular exchange ruling, as there is under the 1938 Maloney Act amendments to the Exchange Act to examine disciplinary action by a registered securities association (i.e., by the NASD), ... a different case would arise concerning exemption from the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today.

*Id.* at 358 n. 12, 83 S.Ct. at 1257 n. 12.

In *NASD, supra,* the Court held that the antitrust laws were repealed regarding the NASD's interpretation of securities laws. 422 U.S. at 721–22, 95 S.Ct. at 2444. The Court relied on the SEC's extensive supervision of the NASD, finding that such pervasive oversight authority suggested that "Congress intended to lift the ban of the Sherman Act from [NASD] activities approved by the SEC." 422 U.S. at 733, 95 S.Ct. at 2449. *See also Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659,

95 S.Ct. 2598, 45 L.Ed.2d 463 (1975) (implied repeal of antitrust laws regarding an exchange's system of fixed commission rates).

Furthermore, *NASD* held that application of the Sherman Act to NASD activities "poses a substantial danger that [the NASD] would be subjected to duplicative and inconsistent standards. This is hardly a result that Congress would have mandated." *Id.*, 422 U.S. at 734, 95 S.Ct. at 2450. Repeal of the antitrust laws was therefore necessary to insure that the regulatory agency could exercise its responsibility without conflicting court judgments rendered pursuant to the antitrust laws. *Id.*

Following these cases, we decided *Harding v. American Stock Exchange, Inc.*, 527 F.2d 1366 (5th Cir.1976). We held that the antitrust laws were implicitly repealed under the Exchange Act concerning the exchange's stock delisting procedures. The SEC's extensive oversight authority dictated this result. *Id.* at 1370.

This precedent clearly indicates that the antitrust laws are impliedly repealed concerning the defendants' actions undertaken in the NASD disciplinary process. As we discussed in Part II, *supra*, the SEC excercises extensive oversight authority over this process. Superimposing the antitrust laws on the securities laws would unduly interfere with the SEC's jurisdiction. Courts might fashion standards that are duplicative or inconsistent with the securities laws and SEC rules, upsetting the balance of interests established by Congress in the Exchange Act.

Furthermore, even though the NASD disciplinary system is to be free of the antitrust laws the purposes of the Sherman Act will still be fostered. Congress has required the SEC to evaluate the anticompetitive effects of its rules, regulations, and actions before adopting them.

Congress noted, however, that its directive to consider anticompetitive impact could have mixed effects, but this order:

> should not be viewed as requiring [the SEC] to justify that such actions be the least anticompetitive manner of achieving a regulatory objective. Rather, the [SEC's] obligation is to weigh competitive impact in reaching regulatory conclusions.... Competition would not thereby become paramount to the great purposes of the Exchange Act, but the need for and effectiveness of regulatory actions in achieving those purposes would have to be weighed against any detrimental impact on competition.

S.Rep. No. 75, 94th Cong., 1st Sess. 13–14 (1975), U.S.Code Cong. & Admin.News 1975, pp. 191–92. Thus, Congress indicated its awareness that the purposes of the securities laws were not identical with those of the antitrust laws, and determined that the securities laws should prevail whenever the two could not be reconciled.

■ An application of the antitrust laws to the defendants' actions in the NASD disciplinary process thwarts Congressional intent underlying the Exchange Act. *See NASD*, 422 U.S. at 732–35, 95 S.Ct. 2449–50; *Gordon*, 422 U.S. at 691, 95 S.Ct. at 2615; *Harding*, 527 F.2d at 1370. Therefore, the federal antitrust laws are not to be applied to the NASD disciplinary process.

■ The district court is directed to dismiss all claims against all defendants for activities regarding the NASD disciplinary process alleged to violate antitrust strictures. "[T]he Sherman Act has been displaced by the pervasive regulatory scheme established by the Maloney and [Exchange] Acts." *See NASD*, 422 U.S. at 735, 95 S.Ct. at 2450. Any alleged anticompetitive injury suffered as a result of defendants' actions disciplining Austin for securities violations must be remedied under the provisions of the securities laws, pursuant to SEC supervision and regulatory authority.

We caution, however, that this holding may not completely dispose of Austin's allegations of antitrust violations. Any dismissal should only relate to activities conducted within the scope of defendants' disciplinary authority, as defined earlier. No implied repeal exists for antitrust activity falling outside the scope of defendants' au-

thority, because no repugnancy exists between the antitrust laws and those actions of defendants that do not receive absolute immunity. Allowing the antitrust laws to operate in this sphere would not unduly interfere with the effective functioning of the NASD or SEC. Therefore, just as defendants enjoy no absolute immunity from prosecution for actions such as some of the alleged defamation and interference with business relations claims, the defendants possess no immunity from antitrust prosecution for alleged anticompetitive activities which fall outside of their official duties. The district court must apply these principles to the facts of this case.

### IX

We finally turn our attention to the refusal of the district court to stay further proceedings pending arbitration of some of Austin's claims. Defendants admit that Austin's malicious prosecution, due process, and antitrust claims are not arbitrable. Defendants contend, however, that Austin's claims of defamation and interference with business relations are arbitrable under the terms of the NASD arbitration clause contained in the membership agreement.

This agreement provides that "any dispute, claim or controversy arising out of or in connection with the business of any member ... (1) between or among members; (2) between or among members and public customers or others ..." is subject to arbitration. *NASD Manual* ¶ 3701. The arbitration clause extends to disputes involving persons associated with a member. *Id.* at ¶ 3708.

Austin contends that its claims are not subject to arbitration, because rather than involving a dispute between or among members, they involve a dispute between a member (Austin) and the NASD itself. Furthermore, plaintiffs contend the action concerns the disciplinary process and not the business of Austin or any other member.

The arbitration clause is ambiguous, and arguably covers this dispute. The dispute involves members of the NASD and their associates on both sides of the suit. Furthermore, the controversy arose out of the business activities of Austin. The propriety of using the disciplinary process was intimately dependent upon the legality of Austin's business conduct with its customers. The arbitration agreement fails to clearly resolve whether the agreement to arbitrate encompasses claims that also involve the NASD itself, or claims arising out of the acts of its officers. In light of the federal policy favoring arbitration, however, the written agreement to submit disputes to arbitration should be liberally construed, and any doubt as to the arbitrability of an issue should be resolved in favor of arbitration. *Moses H. Cohen Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). *See also Wick v. Atlantic Marine, Inc.*, 605 F.2d 166, 168 (5th Cir.1979) ("unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue, then a stay pending arbitration should be granted.")

Austin contends, however, that even if the defamation and inference claims are arguably arbitrable, they are not easily severable from the remaining issues for which the arbitration clause does not apply. For instance, the surviving antitrust claim involves the allegation that defendants defamed Austin and interfered with their business relations in an effort to force Austin out of business. Thus, it contends that the district court properly denied the stay of proceedings pending arbitration.

Our circuit has previously held that a district court may properly deny a stay for arbitration of otherwise arbitrable claims when those issues are inextricably interwoven with the facts of nonarbitrable claims. *Smoky Greenhaw Cotton Co., Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 720 F.2d 1446, 1448 (5th Cir. 1983); *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 334–37 (5th Cir.1981); *Sibley v. Tandy Corp.*, 543 F.2d 540, 543 (5th

Cir.1976), *cert. denied,* 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977). *See also Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023 (11th Cir.1982).

The Supreme Court recently rejected this "intertwining" doctrine in *Dean Witter Reynolds, Inc. v. Byrd,* — U.S. ——, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). When Byrd invested funds with Dean Witter, he signed a Customer's Agreement which required that any controversy between the parties be submitted to arbitration. Byrd subsequently sued Dean Witter in federal district court for violations of the Exchange Act and various state law claims. Pursuant to this clause, Dean Witter sought a stay of proceedings pending arbitration of the pendent state claims.

The parties and district court assumed that the federal securities claims were not arbitrable. The district court denied the stay because the pendent claims were intertwined with the nonarbitrable federal charges. On appeal, the Ninth Circuit affirmed.

The Supreme Court reversed and expressly rejected the intertwining doctrine adopted by the Fifth, Ninth, and Eleventh Circuits. The Court relied on the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.,* which provides that written agreements to arbitrate controversies arising out of an existing "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Court held that this act leaves no room for the exercise of discretion by the district court. *Id.* at ——, 105 S.Ct. at 1239–40. A court must "compel arbitration of pendent arbitrable claims when one of the parties files a motion to compel, even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Id. See also Moses H. Cohen, supra,* 460 U.S. at 20, 103 S.Ct. at 939 ("federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement."). This conclusion

was mandated by Congress in order to enforce private agreements to arbitrate.

■■■ The NASD arbitration clause "evinces a transaction involving commerce." *See Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 401 n. 7, 87 S.Ct. 1801, 1805 n. 7, 18 L.Ed.2d 1270 (1967); *Corey v. New York Stock Exchange, supra,* at 1210 (commerce clause nexus present in securities transactions); *Dickstein v. DuPont,* 443 F.2d 783, 785 (1st Cir.1971) (NYSE arbitration agreement with employee involved commerce); *Shearson Hayden Stone, Inc. v. Liang,* 493 F.Supp. 104, 106 (N.D.Ill.1980); *Macchiavelli v. Shearson, Hammill & Co., Inc.,* 384 F.Supp. 21 (E.D.Cal.1974); *Legg, Mason & Co., Inc. v. Mackall & Coe, Inc.,* 351 F.Supp. 1367, 1370 (D.D.C.1972). The district court, therefore, lacks discretion to decide whether to stay the proceedings, despite the presence of any intertwining nonarbitrable claims. The district court is directed to compel arbitration on any arbitrable issues, including the defamation and intentional interference with business relations claims.

## X

In summary, we hold that the NASD, DBCC members, and the staff members to the extent they have acted as prosecutors are absolutely immune from further prosecution for their actions taken within the outer scope of their disciplinary duties, but that they lack any immunity for actions falling outside such authority. We also conclude that the antitrust laws have been implicitly repealed regarding the NASD disciplinary process, but still apply to any claims by the defendants falling outside their official authority. Finally, we direct the district court to compel arbitration of any arbitrable causes of action.

We remand this case to the district court with instructions to reassess the propriety of granting the motion for summary judgment on any remaining claims in light of this opinion and our recent opinion of *Elliott v. Perez, supra,* which requires more specific pleading of claims against individu-

als entitled to absolute immunity. The order of the district court is vacated and the cause is remanded for further proceedings not inconsistent herewith.

VACATED AND REMANDED.