[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 1, 2006
THOMAS K. KAHN
CLERK

_____

No. 04-13575

_____

D. C. Docket No. 03-61107-CV-WJZ

STEVEN I. WEISSMAN, as Custodian under the
Florida Uniform Transfers to Minors Act,
as Trustee and individually,

                                        Plaintiff-Appellee,

versus

NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.,
a Delaware not-for-profit corporation,
NASDAQ STOCK MARKET, INC., a Delaware corporation
organized for profit,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(November 1, 2006)**

Before TJOFLAT and BARKETT, Circuit Judges, and FULLER,[*] District Judge.

BARKETT, Circuit Judge:

The National Association of Securities Dealers, Inc. ("NASD") and its subsidiary, the NASDAQ Stock Market, Inc. ("NASDAQ"), seek reversal of the district court's denial of their motion to dismiss Steven Weissman's complaint, as well as the district court's order permitting Weissman to engage in pre-trial discovery.[1]  NASD and NASDAQ ("Appellants") claim absolutely immunity from Weissman's suit.  They argue that Weissman complains of conduct undertaken pursuant to their quasi-governmental role as market regulators under the Securities Exchange Act (SEA), 15 U.S.C. § 78a et seq.  The district court rejected this defense, explaining that while Appellants do enjoy absolute immunity for statutorily-mandated regulatory or disciplinary functions, they are not entitled to such immunity in this case because Weissman's complaint relates to private commercial conduct not mandated by the Act.

---

[*] Honorable Mark E. Fuller, United States Chief District Judge for the Middle District of Alabama, sitting by designation.

[1] Weissman's motion to dismiss this appeal for lack of jurisdiction was granted in part by prior order dated October 13, 2004.  Specifically, this Court dismissed the appeal to the extent it sought review of the district court's determination that Weissman adequately pled his state law claims and exhausted his administrative remedies.  We denied Weissman's motion as to Appellants' immunity claims, over which we have jurisdiction.  We noted that our jurisdiction extends to the district court's discovery order; if Appellants' immunity claim is meritorious, they will necessarily be insulated from pre-trial discovery.

2

# BACKGROUND

Between December 2000 and June 2002, Weissman purchased 82,800 shares of WorldCom, Inc. ("WorldCom") stock on behalf of his minor children. In the wake of WorldCom's collapse, and after losing almost the entire investment, Weissman filed a diversity suit in federal district court against the NASD and NASDAQ. Weissman's complaint was initially dismissed for failure to allege diversity of citizenship, but he redrafted it to correct that defect. In his second complaint, Weissman disavowed any reliance on Appellants' regulatory activity as the basis for his suit,[2] emphasizing that "this action is based <u>solely</u> on the for-profit commercial business activity of the Defendants[, . . .] includ[ing] Defendants' approximately $100 million dollar marketing and advertising campaign during the years 2000, 2001 and 2002 to promote and sell . . . shares of WorldCom."

The complaint set forth the following allegations:

First, Weissman alleged that NASDAQ violated Fla. Stat. § 517.301(1)(b) by promoting WorldCom through its marketing and advertising without disclosing

---

[2] Appellants' arguments focus on the allegations in Weissman's first complaint, which is obviously not the one relevant to this appeal. While we may take notice of Weissman's prior pleading to the extent it bears on this appeal, <u>see</u> Paul v. Dade County, 419 F.2d 10, 12 (5th Cir. 1969), it is the allegations in the operative complaint that must support Appellants' claim of absolute immunity if that claim is to prevail.

that their revenues were directly enhanced by increased trading in WorldCom

stock. With regard to this count, Weissman's complaint specifically charged that:

> During 2000 and 2001, NASDAQ[3] expended $74 million
> dollars on marketing and advertising. In 2002, NASDAQ expended
> an additional $27 million dollars on marketing and advertising. The
> marketing and advertising campaign featured NASDAQ-listed
> companies, including WorldCom. NASDAQ published numerous
> print and television advertisements in Florida endorsing WorldCom
> as a great company and a good investment. . . . Though not
> purporting to offer WorldCom stock for sale, NASDAQ undertook
> said advertising and promotion for a consideration received or to be
> received directly or indirectly from WorldCom, market markers
> and/or stock dealers without disclosing the receipt, whether past or
> prospective, of such consideration . . . .
>
> The purpose of NASDAQ's advertising campaign to build the
> "NASDAQ Brand" is to generate revenue through maintaining its
> listings, obtaining new listings and to jointly market shares with the
> listed companies . . . . NASDAQ sought to engender [the] trust and
> confidence of the investing public, including Plaintiff, that when they
> invest in a NASDAQ-listed stock, . . . [they are] assur[ed] of the
> quality of their investment. The failure of NASDAQ to disclose that
> it was compensated by WorldCom, market makers and/or stock
> dealers, directly or indirectly[,] for the advertisements and
> promotions violated Florida Statute Section 517.301(1)(b).
> NASDAQ's advertisements and endorsements of WorldCom carried
> extraordinary weight and power with Plaintiff . . . .

Second, Weissman alleged that NASDAQ offered WorldCom shares for sale

without registering as a broker, in violation of Fla. Stat. § 517.12. With regard to

---

[3] The complaint frequently refers to NASDAQ as the "The For Profit." For the sake of clarity and consistency, when citing the complaint, this opinion will in each instance render "The For Profit" as NASDAQ.

4

this count, Weissman's complaint reiterated that "Plaintiff relied upon the endorsements and recommendation of WorldCom shares by NASDAQ in purchasing same" and that "NASDAQ directly benefitted and profited [from] Plaintiff's purchases of WorldCom shares because, *inter alia*, its income is increased by increased trading volume on the NASDAQ stock market."

Third, Weissman alleged that Appellants committed common-law fraud and/or negligent misrepresentation in their attempts to induce investors to purchase shares of WorldCom. With regard to these counts, Weissman's complaint specifically charged, again, that:

> During 2000 and 2001, NASDAQ and NASD, jointly and in concert with each other, expended $74 million dollars on marketing and advertising. In 2002, NASDAQ expended an additional $27 million dollars on marketing and advertising. The purpose of this marketing and advertising campaign was to induce investors, including Plaintiff, to purchase shares of stock traded on the NASDAQ stock market, including WorldCom, in order to benefit the NASD and NASDAQ . . . by:
>
> (i) generating increased trading volume and the attendant revenue;
>
> (ii) generating and retaining listing income from NASDAQ-listed companies, including WorldCom; and,
>
> (iii) increasing the value of NASDAQ's stock.
>
> As part of [its] advertising and marketing campaign . . . NASDAQ published numerous print and television advertisements in Florida which knowingly, with intent to deceive, endorsed WorldCom and conveyed the false representation and impression

5

that WorldCom was a great company with accounting in accordance with [Generally Accepted Accounting Principles] GAAP . . . . NASDAQ also provided publicity to WorldCom on its web-site and assisted in the dissemination of WorldCom's fraudulent financial statements. The aforesaid advertising and marketing campaign conducted during the year prior to Plaintiff's purchases of WorldCom shares included, but was not limited to . . . a two full page spread advertisement in the Wall Street Journal discussing [NASDAQ's] belief in the need for NASDAQ-listed companies to provide accurate financial reporting in accordance with [GAAP], "supported by a Knowledgeable Audit Committee." On one page is a picture of the NASDAQ ticker with the slogan "The Responsibilities We All Share." On the opposite page under the headline "Keeping Our Markets True – It Is All About Character" is a list of the chief executives of the "good" NASDAQ listed companies under the sub-heading "Our Beliefs Stand in Good Company." Listed thereunder as an endorser of these NASDAQ goals is "Bernard J. Ebbers, President and Chief Executive Officer[,] WorldCom, Inc." . . .

In addition . . ., during the months prior to his purchases of WorldCom shares, Plaintiff saw, heard and relied upon other public media advertisements/communications by the Defendants conveying the same false representations and impression to the effect that WorldCom was a great company with accounting in accordance with GAAP; a good investment; and, that it met the listing requirements of the NASDAQ stock market. . . .

NASDAQ and NASD's advertising and marketing campaign was designed and intended by Defendants to induce investors, including Plaintiff, to purchase shares of WorldCom and, as part of that campaign, Defendants knowingly and intentionally made false laudatory representations regarding WorldCom while concealing their direct profit motive and interest in generating purchases of WorldCom shares. The intention of NASDAQ and NASD in making these false representations and concealing their direct profit motive and interest in selling the stock of that company, was to convince and induce investors, including Plaintiff, to purchase

6

shares of WorldCom.

Elsewhere in his complaint, and in support of his claim that NASDAQ was touting WorldCom stock, Weissman pointed to NASDAQ's April 2001 registration statement filed with the Securities and Exchange Commission (SEC), which stated that "NASDAQ's branding strategy is designed to convey to the public that the world's most innovative, *successful growth companies* are listed on NASDAQ."

Appellants moved to dismiss the complaint, claiming absolute immunity. In the alternative, they argued that Weissman lacked a federal private right of action, failed to exhaust his administrative remedies, and failed to state a cause of action under Florida law. The district court held that both the absence of a federal private right of action, as well as any failure to exhaust SEC remedies, were immaterial because all of Weissman's claims were based solely on state law. It further held that, because Appellants' enjoyment of absolute immunity for quasi-governmental activity does not insulate them from suit for activity related to private business, their alleged advertisement and promotion of WorldCom was outside the scope of such immunity.

Appellants timely appealed. Weissman moved to dismiss the appeal for lack of jurisdiction. We granted that motion in part, dismissing Appellants' claims that

Weissman failed to adequately plead his state law claims and did not exhaust his administrative remedies. We permitted the appeal to proceed as to Appellants' absolute immunity defense, as well as their claim that Weissman lacked a federal private right of action.[4]

## STANDARD OF REVIEW

We review de novo the district court's denial of a motion to dismiss on the basis of immunity. See Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000) (applying de novo standard of review to denial of qualified immunity). We review the complaint, and all inferences to be drawn therefrom, in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true. Id.

## DISCUSSION

Appellants are self-regulatory organizations ("SROs") within the meaning of the Securities Exchange Act, 15 U.S.C. § 78c(a)(26), which vests them with a duty to promulgate and enforce rules concerning the conduct of their members. See 15 U.S.C. §§ 78s(g) and 78f(b); see also Silver v. New York Stock Exch., 373 U.S.

---

[4] Weissman has also moved for attorneys' fees and double costs, arguing that this appeal is frivolous within the meaning of Federal Rule of Appellate Procedure 38. "Rule 38 sanctions have been imposed against appellants who raise 'clearly frivolous claims' in the face of established law and clear facts." Farese v. Scherer, 342 F.3d 1223, 1232 (11th Cir. 2003) (citing Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc., 853 F.2d 834, 841 (11th Cir.1988)). Because Appellants raise colorable arguments as to why the district court's immunity determination should be reversed, we deny Weissman's Rule 38 motion.

341, 352 (1963) (explaining the "federally mandated duty of self-policing by [securities] exchanges").  Our sister circuits have accorded SROs absolute immunity from civil damages for conduct undertaken as part of their statutorily delegated adjudicatory, regulatory, and prosecutorial authority.  See Barbara v. New York Stock Exch., 99 F.3d 49, 59 (2d Cir. 1996); Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc., 757 F.2d 676, 692 (5th Cir. 1985); Sparta Surgical Corp. v. Nat'l Ass'n of Sec. Dealers, Inc., 159 F.3d 1209, 1215 (9th Cir. 1998); Zandford v. Nat'l Ass'n of Sec. Dealers, Inc., 80 F.3d 559 (D.C. Cir. 1996).  Such grants of immunity accommodate SROs' unique position in the regulatory scheme: SROs perform a variety of functions that would otherwise be performed by a governmental agency, but they lack the sovereign immunity which governmental agencies enjoy.  See Barbara, 99 F.3d at 59; Austin, 757 F.2d at 692.

"To be sure, self-regulatory organizations do not enjoy complete immunity from suits."  Sparta, 159 F.3d at 1213.  Only when an SRO is "acting under the aegis of the Exchange Act's delegated authority" does it enjoy that privilege.  Id.  Absolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function.  See D'Alessio v. New York Stock Exch., Inc., 258 F.3d 93, 105 (2d Cir. 2001) ("a[n] SRO, such as the [New York Stock Exchange], may be entitled to immunity

9

from suit for conduct falling *within the scope of the SRO's regulatory and general oversight functions*") (emphasis added); see also Austin, 757 F.2d at 692 ("NASD is entitled to absolute immunity for its role in disciplining its members and associates."); Barbara, 99 F.3d at 59 (absolute immunity granted in suit arising from disciplinary action against employee of exchange member); Sparta, 159 F.3d at 1213 (holding that decision to suspend trading was "a regulatory function cloaked in immunity").

Except with regard to those portions of Weissman's complaint involving NASDAQ's "dissemination of WorldCom's fraudulent financial statements," Appellants fail to carry their burden of demonstrating entitlement to absolute immunity from Weissman's suit.[5]  Although "dissemination" of company financial statements warrants absolute immunity because, at the very least, it is undertaken pursuant to NASDAQ's regulatory authority "to remove impediments and perfect" the free market, 15 U.S.C. § 78o-3(b)(6), the rest of Weissman's complaint expressly and exclusively relates to Appellants' for-profit commercial activity, without any reliance on their quasi-governmental enforcement or regulatory functions.  The complaint mainly concerns Appellants' advertising activities, which, according to Weissman, fraudulently touted WorldCom's stock in order to

---

[5] See Butz v. Economou, 438 U.S. 478, 506 (1978) (burden placed on party claiming immunity from suit).

10

profit from resulting increases in trading volume.  This conduct does not fall "under the aegis" of Appellants' delegated disciplinary or regulatory authority and therefore is not shielded by absolute immunity.  Sparta, 159 F.3d at 1213.

To advertise its own sense of responsibility and its honesty and character, NASDAQ compared itself to WorldCom, asserting that its "Beliefs Stand In Good Company."  This is not a regulatory action.  More generally, the whole point of the advertisements was to entice investors to buy stock on NASDAQ's exchange – such as NASDAQ's exchange-traded fund, QQQ, which included WorldCom.  This, too, is a non-regulatory action.  Indeed, none of NASDAQ's advertisements relate to its statutorily delegated responsibility to "prevent fraudulent and manipulative . . . practices," "promote just and equitable principles of trade," "remove impediments to and perfect" the free market, or "protect investors and the public interest."  15 U.S.C. § 78o-(3)(b)(6).  The advertisements were in no sense mandated by, or coterminous with, any regulatory activity contemplated by the Exchange Act.  This conduct was private business activity; and "[w]hen conducting private business, [SROs] remain subject to liability."  Sparta, 159 F.3d at 1213.

Weissman does not contest either NASDAQ's decision to list or de-list WorldCom, nor any prosecutorial actions that NASDAQ took or failed to take against that corporation.  Although a company's appearance on the NASDAQ

11

exchange is surely a prerequisite to being touted as a sound NASDAQ investment, these occurrences are materially distinct for the purposes of immunity analysis, as only one of them falls under the mandate of the Exchange Act. In listing and de-listing companies like WorldCom, NASDAQ clearly does "stand in the shoes of the SEC." But NASDAQ represents no one but itself when it entices investors to trade on its exchange and, specifically, when it suggests that particular companies are sound investments.

As a private corporation, NASDAQ places advertisements that are patently intended to increase trading volume and, as a result, company profits. Even if NASDAQ's status as a money-making entity does not foreclose absolute immunity for any number of its activities, its television and newspaper advertisements cannot be said to directly further its regulatory interest under the Securities Exchange Act. These advertisements were in the service of NASDAQ's own business, not the government's, and such distinctly non-governmental conduct is unprotected by absolute immunity.[6]

In his partial concurrence, Judge Tjoflat concludes that today's decision

_____

[6] Appellants also argue that the district court erred in concluding that the absence of a federal private right of action proved immaterial because Weissman's cause of action was grounded in state law. Specifically, Appellants argue that this cannot terminate the inquiry, as state-law claims that relate to SRO activities are nonetheless subject to the immunity bar. We agree. However, as discussed above, the conduct Weissman alleges does not "relate to SRO activities." Thus, the district court did not err on this point.

12

creates an untenable precedent, a slope made slippery by the fact that "everything [NASDAQ] does arguably contributes to its coffers." This fear is unwarranted. On the contrary, our holding, in and of itself, marks a clear and sturdy line. In granting immunity for certain contested NASDAQ activities while withholding it from others, we have acknowledged the existence of NASDAQ's absolute immunity while more precisely defining its contours. Far from simply asking whether NASDAQ was enriched by the activities described in Weissman's complaint, our immunity analysis has also and especially asked whether those for-profit activities were quasi-governmental in nature – whether, in other words, they were regulatory, adjudicatory, or prosecutorial actions taken pursuant to the Securities and Exchange Act. Because NASDAQ satisfies this test when it provides to the public the financial statements of companies listed on its exchange, but does not satisfy this test when it engages in advertising activity unsuited to a government actor like the Securities and Exchange Commission, the district court's denial of absolute immunity to Defendants is

**AFFIRMED IN PART and REVERSED IN PART.**

13

TJOFLAT, Circuit Judge, concurring in part and dissenting in part:

I concur with the portion of the majority's decision reversing the order of the district court and holding the appellants immune insofar as Weissman bases his claims on the links to WorldCom's financial statements on NASDAQ's internet site. I respectfully dissent from the remainder of majority's opinion, however, because I believe that all of the other activities for which Weissman seeks to hold the appellants liable fall within the broad scope of the appellants' regulatory duties under the Exchange Act. Accordingly, NASD and NASDAQ should enjoy immunity from all of Weissman's claims.[1]

---

[1] A note on the evolving relationship between NASD and NASDAQ is in order. At its inception, NASDAQ was a wholly-owned subsidiary of NASD. In 1996, NASD delegated to NASDAQ functions and responsibilities relating to the operation of NASDAQ's stock market, including the authority "[t]o develop, adopt and administer rules governing listing standards applicable to securities traded on The Nasdaq Stock Market and the issuers of those securities." Order Granting Approval of Proposed Rule Change by NASD Relating to the Allocation and Delegation of Authority and Responsibilities, Exchange Act Release No. 37,107, 61 Fed. Reg. 16,948, 16,952 (Apr. 18, 1996).

NASD subsequently, between 2000 and 2002, divested itself of the majority of its equity interest in NASDAQ. See Order Approving Proposed Rule Change Amending the NASDAQ By-Laws and Restated Certificate of Incorporation, Exchange Act Release No. 42,983, 65 Fed. Reg. 41,116, 41,116 (July 3, 2000). As required by the SEC, however, NASD retained voting control over NASDAQ via a voting trust pending approval of NASDAQ's application for registration as a separate national securities exchange. See Notice of Filing of Application for Registration as a National Securities Exchange, Exchange Act Release No. 44,396, 66 Fed. Reg. 31,952, 31,953 (June 13, 2001). See also 15 U.S.C. § 78f (registration of national securities exchanges); 17 C.F.R. § 240.3a1-1 ("An organization . . . shall be exempt from the definition of the term 'exchange' . . . if such organization . . . [i]s operated by a national securities association.").

At all times relevant to this appeal, NASDAQ's application for registration as a national securities exchange was still pending. Accordingly, it operated under the supervision of NASD, and thus the Exchange Act provisions relevant to this appeal are those governing national securities associations, of which NASD is one. See 15 U.S.C. § 78o-3. In addition, the rules

14

**I.**

In his complaint, Weissman alleges that he bought WorldCom shares in reliance on several NASDAQ representations, all of which were false and made by NASDAQ for the purpose of inducing investment in WorldCom stock. These representations, and the means NASDAQ used to make them, are alleged as follows:

1. WorldCom met NASDAQ's listing requirements for audit committees; that is, WorldCom possessed an audit committee composed of three financially literate, independent directors. NASDAQ made this representation implicitly through advertisements that named WorldCom as a company whose stock was traded on its exchange, and thus, by definition, met the listing requirements. One series of advertisements appeared on television, beginning in September 2001, and described NASDAQ's own exchange-traded fund, known as QQQ. This fund

---

then governing the operation of the NASDAQ exchange were included among the rules in the NASD Manual.

After this appeal was argued and submitted, the SEC approved NASDAQ's application to register as a national securities exchange, and thus NASDAQ now operates as an independent SRO. See Order Approving Proposed Rule Change and Notice of Filing Following the Nasdaq Exchange's Operation as a National Securities Exchange, Exchange Act Release No. 34-54084, 71 Fed. Reg. 38,935, 38,935 (July 10, 2006). Accordingly, the rules governing the operation of the NASDAQ exchange have been removed from current versions of the NASD Manual and are now found in a separate NASDAQ Manual. See id.; NASDAQ Manual, Rules 4300 through 4950 (2006), available at http://nasdaq.complinet.com/nasdaq/display/index.html. Because, however, the NASD Manual governed NASDAQ at all times pertinent to this appeal, I refer throughout this opinion to the relevant "NASD Rules."

15

tracked the performance of NASDAQ's 100 largest companies, including – at that time – WorldCom.[2] Another advertisement appeared in the Wall Street Journal on April 11, 2002. Under the headline "Keeping Our Markets True – It Is All About Character," one side of this advertisement consisted of a picture of the NASDAQ ticker, located in Times Square, with the slogan "The Responsibilities We All Share." Adjacent to the picture of the stock ticker, NASDAQ set forth a number of general statements summarizing the requirements it believed necessary to safeguard a fair and honest market, including the role of "knowledgeable Audit Committee[s]" in providing accurate information to investors. The other side of the advertisement consisted of a list of dozens of CEOs of NASDAQ companies – including Ebbers of WorldCom – under the subheading "Our Beliefs Stand In Good Company."

2. WorldCom's financial statements were prepared in accordance with generally accepted accounting principles ("GAAP") and thus were accurate. NASDAQ made this representation implicitly by listing the names of Ebbers and WorldCom in the Wall Street Journal advertisement of April 11, 2002, which also referenced NASDAQ's "belief" in GAAP.

3. WorldCom was a "good" investment. NASDAQ made this representation

---

[2] Shares in exchange-traded funds are traded on exchanges and represent ownership interests in a fund holding securities of the companies tracked by the fund. Shares in QQQ are traded on NASDAQ and represent ownership interests in the NASDAQ-100 Index Trust, which holds securities of the 100 highest market-capitalized companies listed on NASDAQ.

implicitly through the television and newspaper advertisements, which "touted" the companies listed on its exchange, including WorldCom.

Underlying all these representations, according to Weissman, was NASDAQ's ulterior motive. His complaint alleges that NASDAQ's management – its officers and directors – listed and touted WorldCom because they had a financial incentive to do so. That is, the greater the number of companies NASDAQ listed on its exchange and the more investors traded in shares of the listed companies, including WorldCom, the greater NASDAQ's profits and the officers' and directors' compensation. Weissman patently intends his allegations of NASDAQ's profit motive to distance his complaint from the regulatory functions protected under the immunity doctrine. He asserts that his suit is "based solely on the for-profit commercial business activity" of the appellants and disclaims any connection between that activity and the appellants' regulatory functions under the Exchange Act. The majority credits Weissman's disavowal of any reliance on the appellants' regulatory activities to support his claims, holding that the alleged profit motive behind NASDAQ's representations places its actions outside the scope of the regulatory duties that NASD and NASDAQ assumed under the Exchange Act and SEC regulations.

I am of a different view. While we must accept the factual allegations of

Weissman's complaint as true in reviewing the denial of the motion to dismiss, any conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts do not prevent dismissal. See Oxford Asset Mgmt. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002); see also Associated Builders, Inc. v. Ala. Power Co., 505 F.2d 97, 100 (5th Cir. 1974). Because the facts relevant to the immunity question are deemed undisputed and reasonably construed in Weissman's favor upon review of the district court's dismissal of the complaint, the scope of immunity applicable in this case is purely a question of law. See Austin Mun. Sec. Inc. v. NASD, 757 F.2d 676, 685 (5th Cir. 1985) (determining the scope of absolute immunity as a matter of law where facts critical to the issue were not disputed in the record). Accordingly, we cannot accept as determinative Weissman's bald assertion that, because they were taken "for-profit," the actions he complains of fall outside the scope of regulatory actions for which the appellants are immune under the Exchange Act. Nor, in any event, should an alleged profit motive on the part of the NASD and NASDAQ be dispositive; as discussed in greater detail below, "the intent with which . . . defendants operate is irrelevant to the absolute immunity issue." Id. In order to answer the immunity question, we must examine only the nature of the specific actions complained of, not the reason those actions were taken. I believe that, when viewed with the proper degree of specificity, the actions

18

about which Weissman complains are ultimately regulatory in nature, and the appellants are thus entitled to immunity.

## II.

### A.

In framing the Exchange Act of 1934 and its subsequent amendments, Congress envisaged a system of "cooperative regulation" in which regulation of the over-the-counter market would be "largely performed" by self-regulatory organizations ("SROs") – "representative organizations of investment bankers, dealers, and brokers" – with the SEC "exercising appropriate supervision in the public interest." See S. REP. 75-1455, at 4 (1938). When acting pursuant to this mandate, NASD and NASDAQ effectively stand in the shoes of the SEC, see Austin, 757 F.2d at 692, which enjoys sovereign immunity from suit, Sprecher v. Graber, 716 F.2d 968, 973–74 (2d Cir. 1983). Accordingly, NASD and NASDAQ enjoy absolute immunity from suit when "acting under the aegis of the Exchange Act's delegated authority[.]" Sparta Surgical Corp. v. NASD, 159 F.3d 1209, 1214 (9th Cir. 1998); see also, e.g., DL Capital Group, LLC v. NASDAQ, 409 F.3d 93, 97 (2d Cir. 2005) ("There is no question that an SRO and its officers are entitled to absolute immunity when they are, in effect, 'acting under the aegis' of their regulatory duties." (quoting Sparta, 159 F.3d at 1214)).

19

Certain types of activities regularly performed by SROs fall unambiguously "under the aegis" of the functions delegated by the Exchange Act. These activities are characteristically governmental in nature. See Sparta, 159 F.3d at 1214 ("[T]here are few functions more quintessentially regulatory than suspension of trading."); Barbara v. N.Y. Stock Exch., 99 F.3d 49, 58 (2d Cir. 1996) ("[T]he courts have not hesitated to extend the doctrine of absolute immunity to . . . adjudicatory and prosecutorial duties."); Austin, 757 F.2d at 692 ("We . . . conclude that the NASD is entitled to absolute immunity for its role in disciplining its members and associates.").

The immunity doctrine is not so inflexible, however, as to be strictly limited in scope to these few "quintessentially regulatory" activities. Immunity extends to protect an SRO from claims based on "conduct consistent with the quasi-governmental powers delegated to it pursuant to the Exchange Act and the regulations and rules promulgated thereunder." DL Capital Group, LLC, 409 F.3d at 97 (emphasis added) (quoting D'Alessio v. N.Y. Stock Exch., 258 F.3d 93, 106 (2d Cir. 2001)). See also D'Alessio, 258 F.3d at 105 (recognizing the "broad authority delegated . . . by the Exchange Act" and holding that an "SRO . . . may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions." (construing Barbara, 99 F.3d at 59)).

20

This broad interpretation of the scope of SROs' immunity is "consistent with the structure of the securities market as constructed by Congress." See Sparta, 159 F.3d at 1213. NASD adopts its rules pursuant to its mandate under Section 15A of the Exchange Act, which imposes upon NASD the duty to adopt and enforce rules "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest." 15 U.S.C. § 78o-3(b)(6). The SEC, pursuant to its statutory oversight authority, must approve all NASD rules before they are implemented, 15 U.S.C § 78s(b), and may "abrogate, add to, and delete from . . . the rules . . . as [it] deems necessary or appropriate," 15 U.S.C. § 78s(c).

The Exchange Act's expansive language indicates the breadth of NASD's self-regulatory authority to perform the duties delegated to it; however, that authority is exercised subject to the SEC's direct supervision of all of NASD's regulatory activities. The close oversight of SROs by the SEC is precisely what justifies their immunity from suit for regulatory actions. NASD "stands in the shoes" of the SEC, and thus is "entitled to the same immunity enjoyed by the SEC when [NASD] is performing functions delegated to it under the SEC's broad oversight authority." See D'Alessio, 258 F.3d at 105. Without the SEC's

imprimatur, NASD would no more have grounds for asserting immunity for a particular action than any market participant. Thus, the determination of whether a given action by an SRO is properly considered quasi-governmental – and thus immune – rests entirely on whether the nature of the action complained of falls within the broadly construed authority granted by the Exchange Act and supervised by the SEC.

This regulatory scheme leaves a good deal of room for SROs to take actions consistent with applicable rules and regulations in order to fulfill the mandates of the Exchange Act. In seeking to circumvent this broad immunity, however, plaintiffs have often couched claims against SROs – claims that ultimately arise from the organizations' actions consistent with their duties under the Exchange Act – in terms of bad faith and fraud. See DL Capital Group, LLC, 409 F.3d at 98–99; D'Alessio, 258 F.3d at 98, 106; Sparta, 159 F.3d at 1215. In so doing, plaintiffs have alleged bad-faith or fraudulent motives in hopes of re-characterizing SROs' actions as falling outside the scope of immunity. These attempts have been unavailing, as courts have properly rejected attempts to create a bad-faith exception to the absolute immunity doctrine protecting self-regulatory organizations. See DL Capital Group, LLC, 409 F.3d at 98–99; Sparta, 159 F.3d at 1215. Aside from the general precedential principle that absolute immunity cannot be overcome by

22

allegations of bad faith or fraud, see, e.g., Macuba v. Deboer, 193 F.3d 1316, 1321 (11th Cir. 1999), a bad-faith exception to the immunity doctrine is unadvisable "[a]s a matter of common sense. . . . It is, after all, hard to imagine the plaintiff . . . who would – when otherwise wronged by an SRO but unable to seek money damages – fail to concoct some claim of fraud in order to try and circumvent" immunity. DL Capital Group, LLC, 409 F.3d at 99. See also Sparta, 159 F.3d at 1215 (holding that although "the results of any immunity rule may be harsh" to a putative plaintiff, SROs must be immune for regulatory actions taken "in a capricious, even tartuffian manner which caused [the plaintiff] enormous damage").

B.

To determine whether NASD and NASDAQ should enjoy immunity from the claims in this case, we must look not at the manner in which Weissman casts his claims, but instead at the nature of the specific actions alleged by Weissman to have caused him injury. See D'Alessio, 258 F.3d at 105–06. Weissman does not dispute that NASD and NASDAQ enjoy absolute immunity when acting in their regulatory capacity. To the contrary, he claims that what they did – what induced him to buy WorldCom stock – was to engage in activity falling outside of their regulatory function. By referencing WorldCom in their television and newspaper advertisements, he contends, NASD and NASDAQ represented that WorldCom

23

satisfied its listing requirements and thus implied that WorldCom was a sound investment. I will address first the television advertisements, then the newspaper advertisement.

1.

Weissman first complains about a series of television advertisements that, according to his allegations, ran for some time beginning the week of September 24, 2001 during "major prime time programming." Reading Weissman's vague allegations about the content of these advertisements in the light most favorable to him, the ads promoted the sale of the NASDAQ-100 Index Trust, or QQQ ("the QQQ fund"), which is the exchange-traded fund offered by the for-profit entity NASDAQ. At the time Weissman viewed the advertisements, WorldCom was one of NASDAQ's top-100 companies, and its stock was included in the QQQ fund. According to Weissman, the advertisements "feature[d] a group of companies included in the trust," including WorldCom. It was upon this mention of WorldCom that Weissman allegedly relied in drawing the inference that WorldCom must meet listing requirements, conduct its finances in accordance with GAAP, and generally constitute a "good investment."

It is true, as Weissman argues, that "[w]hen conducting private business, [SROs] remain subject to liability." Sparta, 159 F.3d at 1214. Perhaps it may also

24

be true that the television advertisements about which he complains constitute "private business" on the part of NASD and NASDAQ to the extent that they promote and stimulate trading of shares in the QQQ fund itself (as distinct from shares of its component securities, which are not products of NASDAQ). But we need not decide that case, for Weissman's allegations with regard to the television advertisements do not link his alleged injury to the aspect of the ads that may constitute non-immune, "private business" conduct. Weissman does not allege that he bought shares of the QQQ fund in reliance on the ads promoting that fund, and therefore suffered harm. There are no allegations that Weissman ever purchased shares of the QQQ fund. Rather, he alleges that he bought shares of WorldCom, to his detriment, in reliance on an implicit representation contained in NASDAQ's mere mention of the WorldCom name in the ads. His allegations of injury do not depend on the representation, arguably made by NASDAQ through the advertisements, that the QQQ fund was a good investment. Instead, Weissman bases his claims on the theory that, by mentioning WorldCom in the context of an advertisement that promoted the QQQ fund as a good investment, and given that WorldCom stock was a constituent element of the QQQ fund, NASDAQ implicitly represented something about the quality of WorldCom stock as a potential investment.

Creative pleading, however, cannot save a claim that fails as a matter of law. At their core, Weissman's allegations ultimately speak to the duties of NASD and NASDAQ to decide whether or not certain securities should be listed on the exchange and to communicate those decisions – duties that fall squarely within the universe of quasi-governmental regulatory functions for which NASD and NASDAQ enjoy immunity from suit. Weissman does not allege that the television advertisements made any specific representation about WorldCom whatsoever; they simply mentioned the name of WorldCom in the context of the QQQ fund. Thus, in essence, the act about which Weissman complains is not that NASDAQ advertised the QQQ fund, but that NASDAQ mentioned that WorldCom was one of the 100 largest concerns listed on the exchange.

NASDAQ's communication of those simple facts about WorldCom pertains directly to the regulatory function of NASD and NASDAQ to make listing decisions, and the corollary duty to announce listing decisions to the public. The duty to monitor compliance with the listing standards and de-list companies for failing to adhere to them falls squarely within the self-regulatory framework provided by the Exchange Act. NASD Rules provide the standards for initial and continued listing on NASDAQ's stock exchange and delegate to NASDAQ the responsibility for enforcing these listing standards. See NASD Manual, Rule 4300,

26

et seq. (2005). NASD Rules also give NASDAQ "broad discretionary authority over the initial and continued inclusion of securities in Nasdaq in order to maintain the quality of and public confidence in its market." NASD Manual, Rule 4300 (Aug. 26, 2005). NASD and NASDAQ therefore enjoy absolute immunity from liability for acts committed in discharging such duties.[3] See Sparta, 159 F.3d at 1214 ("[T]here are few functions more quintessentially regulatory than suspension of trading.").

Furthermore, the ability of NASD and NASDAQ to announce publicly the exercise of their quasi-governmental regulatory duties is inherent in those duties, or is, "at the very least, certainly consistent with [NASDAQ's] quasi-governmental powers as an SRO." DL Capital Group, LLC, 409 F.3d at 98 (internal quotations omitted, emphasis and alteration in original); see also Basic Inc. v. Levinson, 485 U.S. 224, 245–46, 108 S.Ct. 978, 991, 99 L. Ed. 2d 194 (1988) (noting that

_____

[3]Although the majority focuses its discussion on allegations that NASDAQ sought to profit from the advertisement scheme, those portions of Weissman's complaint quoted in the majority opinion also contain allegations that directly invoke the core regulatory functions of SROs. For example, Weissman alleges that, among other purposes, NASDAQ initiated the ad campaign "to generate revenue through maintaining its listings [and] obtaining new listings . . . [and to] engender trust and confidence of the investing public" (emphasis added) – actions that fall squarely within the regulatory framework established by the Exchange Act, regulations, and NASD Rules. These allegations directly contradict Weissman's disclaimer of any reliance on NASDAQ's regulatory functions. Although I do not believe these contradictory allegations are necessary for a finding that the appellants are entitled to immunity – after all, we must construe pleading ambiguities in Weissman's favor – they reveal the extent to which Weissman's claims are inseparable from the appellants' regulatory duties. Indeed, even in his conscious attempt to craft his complaint without reference to regulatory functions, Weissman apparently was not able to avoid describing some of those activities for which SROs are clearly immune from suit.

27

"Congress expressly relied on the premise that securities markets are affected by information" in drafting the Exchange Act); Barr v. Mateo, 360 U.S. 564, 575, 79 S. Ct. 1335, 1341, 3 L. Ed. 2d 1434 (1959) ("It would be an unduly restrictive view of the scope of the duties of a policy-making executive official to hold that a public statement of agency policy in respect to matters of wide public interest and concern is not action in the line of duty.").

Fundamentally, Weissman's allegations about the television advertisements do not implicate any action by NASD or NASDAQ beyond the decision to continue listing WorldCom and the communication of that decision to the marketplace by including the name of WorldCom as among the companies traded on the exchange. These activities fall within the scope of the quasi-governmental activities covered by the immunity doctrine.

2.

Weissman also complains of an advertisement NASDAQ ran in the Wall Street Journal on April 11, 2002. He alleges that NASDAQ ran the ad "[s]eeking to calm the markets in the wake of the Enron fraud."[4] The advertisement, which

[4]Here again, Weissman reveals by the language of his pleading that his claims necessarily implicate regulatory functions by NASD and NASDAQ. If, as Weissman alleges, the Wall Street Journal advertisement was an action taken "to calm the markets," that activity must fall within NASDAQ's regulatory duties to "remove impediments to and perfect the mechanism of a free and open market," 15 U.S.C. § 78o-3(b)(6), and "preserve and strengthen the quality of and public confidence in its market." NASD Manual, Rule 4300 (Aug. 26, 2005). In any event, the immunity inquiry must be determined through an independent examination of the specific nature

consisted of a full two-page spread, identified the CEOs of some of the companies listed on NASDAQ's exchange. Ebbers's and WorldCom's names appeared among dozens of others opposite some general statements of the principles underlying NASD's rules – principles such as independent audit committees and acceptance of standard accounting practices. Weissman argues that because NASDAQ chose to name Ebbers and WorldCom opposite the statements regarding listing requirements, and because the ad included headlines such as "It's All About Character" and "Our Beliefs Stand In Good Company," NASDAQ was implicitly representing that WorldCom met listing requirements regarding the audit committee and GAAP and was a "good investment."

As with the television advertisements, NASDAQ's action in publishing the newspaper advertisement falls within the scope of its regulatory duties. No reasonable reading of the content of the advertisement can support Weissman's allegation that the ad constituted a non-regulatory representation "touting" WorldCom. One entire page of the ad consisted of statements summarizing NASDAQ's listing standards; the communication of that content could not be more obviously related to NASD's and NASDAQ's performance of their listing duties under the Act, which is covered by immunity. The inclusion of the names of

_____

of the advertisement, regardless of what Weissman claims about NASDAQ's motive in publishing it.

Ebbers and WorldCom adjacent to that content does nothing to convert the advertisement into something outside the scope of NASD's and NASDAQ's quasi-governmental functions. The part of the advertisement listing the names of CEOs and companies merely communicated that those companies were currently being traded on the exchange in accordance with the rules summarized in the other part of the advertisement. As I have noted supra, the authority to list companies on NASDAQ's exchange – which is part of NASD and NASDAQ's regulatory function – necessarily encompasses the authority to announce which companies are listed at any given time, as WorldCom was at the time of the advertisement. See DL Capital Group, LLC, 409 F.3d at 98 ("[A]nnouncing the suspension or cancellation of trades is as much a part of the defendants' regulatory duties as is the actual suspension or cancellation of trades." (internal quotation marks omitted)).

In light of the obvious regulatory nature of the newspaper advertisement, the gravamen of Weissman's claims is laid bare. Stated in its most basic terms, Weissman's complaint is that NASD and NASDAQ continued to communicate that WorldCom was being traded on its exchange when they either knew or should have known that WorldCom was in serious trouble. That NASD and NASDAQ may have fallen down on the job in continuing to list WorldCom, however, is irrelevant to the question of whether they are covered by immunity for communicating that

30

decision to the marketplace. That they may have decided to continue listing WorldCom in order to increase their profits, as Weissman alleges, is also irrelevant. The action was essentially regulatory in nature, and thus NASD and NASDAQ should enjoy immunity from all of Weissman's claims.

## III.

Finally, I respectfully suggest that in addition to reaching the wrong result in this case, the majority's opinion establishes an untenable precedent. The regulatory scheme established by the Exchange Act allows an exchange to operate for profit under the auspices of an SRO's regulatory authority, at least in the case of NASDAQ specifically. In 2000, the SEC explicitly approved the restructuring of NASDAQ into a for-profit entity under the supervision of NASD, finding it "consistent with" the requirements set forth in the Exchange Act. Order Approving Proposed Rule Change Amending the Nasdaq By-Laws and Restated Certificate of Incorporation, Exchange Act Release No. 42,983, 65 Fed. Reg. 41,116, 41,118 (July 3, 2000). Because NASDAQ operates for profit, everything it does arguably contributes to its coffers. Simply by listing a new concern on the exchange – the most obvious regulatory function – NASDAQ will profit from the listing fees and trading of the newly listed company's shares. Obviously, the SEC has determined that the operation of an exchange for profit in such a manner is not inherently

31

inconsistent with the regulatory functions for which an SRO merits immunity from suit. But the majority's approach suggests no limit beyond which a plaintiff's allegation of profit-seeking could not reach to circumvent an SRO's immunity. Taken to its extreme, this reasoning could expose NASDAQ to suit for damages allegedly resulting from any action taken in the operation of the exchange.

At the very least, the majority's holding will seriously impact the practicalities of litigation strategy in future suits by investors against SROs for investment losses. As the majority would have it, an aggrieved investor like Weissman need simply identify any action by an SRO that may be motivated by profit and allege that the action falls outside a narrowly defined set of regulatory activities. By pleading these magic words, the investor can avoid a detailed analysis of whether the exchange is entitled to immunity for its action, and he may proceed with his litigation. Discovery will of course reveal the true contours of the investor's claim, but the prospect of expensive discovery will likely pressure the SRO to settle regardless of the merit of the complaint.

The majority's narrow construction of what may be considered "regulatory" ignores the broad scope of immunity that is intended under the Exchange Act. Moreover, it thwarts the public policy of the immunity doctrine by ultimately requiring more suits against SROs to proceed into litigation. For example, there

32

may be any number of situations in which advertising by an SRO might be consistent with its regulatory duties; I would argue that the case at hand so qualifies. Under the majority's holding, however, an SRO must think twice before speaking to the public, lest its advertisements be construed categorically as profit-seeking and thus non-regulatory, regardless of their actual nature. This necessarily limits the SRO's ability to exercise the broad regulatory discretion delegated to it. Of course, there may also be instances in which an advertisement crosses the line into purely commercial, non-regulatory activity. Claims based on the non-regulatory aspect of such an advertisement would properly avoid an SRO's immunity. I simply believe that a more searching inquiry than that undertaken by the majority is required to make that distinction.

The majority's result cannot be consistent with the regulatory framework established pursuant to the Exchange Act and approved under the supervision of the SEC. Accordingly, I dissent from the portion of the majority opinion affirming the order of the district court.